Call the second case. Case number 092514. Marriage of Philip Karafotas. Council, step up and identify yourself that you can argue. Good morning, your honors. I'm Howard London. I'll be representing Pamela Karafotas, the appellant. Good morning, your honors. Christopher Gallinari on behalf of Philip Karafotas. You saw we're somewhat lenient, maybe too lenient, and maybe ask too many questions, but that seems to be the way we operate. So with that in mind, proceed. Thank you. If I may please the court, council. Our argument is simple. This is a case where my client, Pamela Karafotas, in a marital settlement agreement settling her divorce from Philip Karafotas, was awarded 50% of the net proceeds from the sale of an asset known as an IMM membership in the Chicago Mercantile Exchange. The marital settlement agreement specifically refers to the IMM membership as an asset and then proceeds to say here and after referred to as the IMM membership. You didn't write the contract. I didn't write the contract. Okay. We know what happened after that. There is no dispute of fact as to what happened after that agreement was signed. We know that the Chicago Mercantile Exchange demutualized. We know, and it's undisputed, that in the sequence from demutualization through merger into a publicly held corporation called CME Holdings, that Philip Karafotas' asset described as his IMM membership was transformed and converted. It was transformed from a participation interest in a privately held non-stock company into stock in a publicly held company. That's undisputed, and it's undisputable. Every single piece of paper issued by the CME, Chicago Mercantile Exchange, explaining and describing the transaction, every prospectus, every legal document that was given to CME members, shareholders, publicly filed documents, privately generated documents explain that. There is no question that at the time of the divorce, the asset known as an IMM membership was a unitary asset. All of the, yes? Question. At the close when the contract was finalized, the parties waived certain things and took all future rights. This event occurred subsequent to. Now, you make a statement, the interest transfers invest, but does not the subsequent act become a non-marital and therefore the equity interest does not transfer? No. They waive everything except, the document says they waive everything except what they don't waive. And they give up. Well, it says they waive any future. Any future would be subsequent to the signing of the document. The only thing that they waived was property that they did not have an interest in, that was not granted to them, that somebody might acquire in the future. Well, this wasn't granted to her. Yes, it was. Oh, a conditional entity was granted to her. Let's talk about what was given to him and what was given to her. What was given to him was, in essence, a life estate unless he sold it. No, it's not a life estate because it transfers to his kids. No, no, no. If he doesn't sell it. No, no, no. If he died. The agreement has two qualifications. No, no, no. If he died before. If he died before Pamela, she gets the entire seat. Right. Right. Okay, so he had the right to die, in which case my client had the right to receive the seat. He had the right to sell the seat or the membership. It was the membership. He had a right to sell the membership. Membership only, technically. Well, the asset that was known. The asset. The asset. Right. So that's why I was about to say, let's look at what was the asset. What are we talking about? At that time, it was a unitary asset. He had an ownership interest in the CME that he held through a membership. That included equity and whatever the business of the CME was. It included trading rights. Because of the way the CME and the memberships were structured at that time, he could not sell or convey his trading rights apart from his equity. He could lease his trading rights, but he couldn't sell it. So what happened was the CME, in its wisdom, as set forth in all the documents, decided, you know, we're sitting on a gold mine here. There's a business, there's huge welfare that's untapped, that exists independently of the right to trade. We have a business. We can be a for-profit business. We don't have to just be a business that exists for the traders to buy and sell their commodities on their own. We can be a huge business, and we should do that in order to survive. So what do they do? They decide there's a market to sell off pieces of their business. And how do they do that? Well, they could have done it a number of ways, but they decided to become the first exchange in the country to do what they call demutualize. They went from being this private entity, and the plan was to become a public entity. That happened only seven months after this MSA was entered into. Is that right? No, actually the MSA was entered into in January of 2000. The settlement, the judgment was entered in April. The demutualization was approved in June of 2000, and the first stage of the demutualization was completed in November of 2000. And three steps happened in that period of time, all after the divorce. So after the divorce, Phillips' membership interest, that asset, was exchanged, converted, replaced by a comparable IMM membership in a new entity called CME Transitory. That's shorthand, but they called it CME Transitory. Then, as part of that same transaction, all completed by November of 2000, CME Transitory was merged, which was still a private company, was merged into Delaware CME, which was a corporation. And at that point, Phillips' IMM membership in Transitory was converted into one share of stock, of IMM class stock. He now had a share of stock. The membership was gone, the old membership was gone, replaced by one share of stock in a new entity. Subsequently, that corporation, Delaware, recapitalized, and his one share of stock was exchanged for and replaced by approximately 11,000 shares of class A and one share of class B. So both of those classes, A and B, came from the one share of one class. What you call the unitary bundle. Came from the unitary bundle, both. And, in fact, you don't have to take it from me, because I didn't make this up. I only take the facts as they gave me. And we quote from a- No, we're not disagreeing with you on that point. Okay. No, it seems like it went from unitary to hybrid, to use a different word, because he gets the class A stock and then the one share of class B stock. The question that we have looking at the intent, or trying to look at the intent of the parties is, since this happened not that long after, is there any reason that we shouldn't think that this was the subject of discussion, the upcoming IPO? In other words, they both fully understood this was going to happen. In whatever form. And they were both well-informed, since they were both in the market. So, first question is, why did she agree to this contract when it should have had a conditional clause in it? And I understand you didn't write it. But it is a contract, and you're bound by its terms, one. And, two, what I keep saying is the equity interest doesn't transfer, but you're disagreeing with me. But the other third thing is, shame on her for entering into a closed-door contract that does not give any clear options. I understand that you're back-dooring in, or trying to back-door in. And basically that's what you're doing. Because you're saying there's a condition somewhere in there. But in reality, that's a closed-door contract, and it doesn't have any doors. And you're creating a bundle, and you say the bundle shifts. But I'm saying I don't see it, because when they signed off on the contract, and they expressly say that this is an economic severance, and then they say we waived this, we did this, we did this, including any future ABCs. But the key issue is this became a non-marital asset. So get me off of the non-marital asset and show me how a non-marital asset still remains an equity interest in her when they finalized it. Because while the asset remained with him, that was his asset, she had an absolute right to 50% of the sale proceeds from that asset. But it's not a sale. Well, we're not there yet. The argument is it hasn't been traded. Well, we're not there yet. We're not there yet. The question is, let's break it down. And I'll answer your other question about what about their discussions, but let me address this question first, because you've asked a couple of questions. So what was it that existed at the time of the divorce that she was entitled to 50% of the sale proceeds from? It was an asset. It was called a membership. It was in Company A. Now, they're going to argue that even after all this is said and done, the One Class B and the membership are still there. So in reality, she hasn't lost anything. She just hasn't gained anything. Yeah, she only lost about $2 million. Well, no, she still has the asset as it stood, which is now worth more than it was when they closed on it. What if it was worth less? Does it make a difference? It doesn't. Well, it doesn't. Because what if the facts were this? What if at the time, because value really goes up and down. We saw one day where the stock market dropped 1,000 points. So let's say that at the time of the judgment, the seat was worth $1 million, and then afterwards they broke it up into pieces like they did, and he sold off half of it for $500,000, and he still had a Class B share that was worth $500,000. So then I guess I would get the standard and say, look, 500 plus 500 equals a million. That's the answer. But that really isn't the answer, because there was no way to know what anything would be worth, and there was no way to peg it to what was worth. That's why they used the percentage. Nobody guaranteed that anybody would make any money or that anybody would lose any money. However, to address your question about marital versus non-marital, the question is not about the classification of the asset as marital or non-marital, because even if an asset is non-marital, Mr. Karafotis can still agree that if he sells a non-marital asset, he'll give something to Pamela Karafotis, which is what he did. Let's assume that this demutualization had never taken place. After the judgment, the judgment's over. Now he goes out. Let's say he sold it in May, or let's say he sold it in October. Let's say he sold it on November 12th, the day before this demutualization became final. Well, she'd get her 50% of the proceeds. So it was a future event, and it happened. But what happened? If you go to the next day, that asset was transformed. So on November 14th, the day after November 13th, what you now have is you have that original membership is replaced by stock, one share of stock, which became the Class B. Right. No, no, no, no, no, no. Class A and Class B. Initially, it was an IMM class share of stock, and that was split. Now, if you look at, and this is what I was about to say, is that the CME, in all of its documentation, says the same thing basically over and over and over again in various ways. But in a CME holdings memorandum, which explains the whole transaction and how it was structured for tax purposes and for all other purposes, and this is at appendix 135, quoting, as a consequence of the demutualization and the merger, therefore, each old CME membership interest is now represented by CME holdings, Class A and Class B common stock, and a new membership interest. Okay. So Philip, yes, he has a membership interest. It's called number 602. He keeps telling us it's 602, 602, 602. Well, what if it was 622 or 1200 or it was 206? Would it make a difference? What's a label? What if they changed the name of his membership to World Money Markets instead of IMM? Would that make a difference? This case isn't about labels. It's about an asset. My client was given a vested right to 50% of the proceeds from the sale of that asset. The asset was broken into pieces. We can't disagree with that. It was broken into pieces. The CMM did that. The members voted for that. It was broken into pieces called a B share and a bunch of A shares. The A shares he sold were pieces of the old membership. The CME says that. They say the Class A's replaced the original membership. The new membership is not the same membership. Now, Philip concedes in his papers below that, and Your Honor hit on that, he sells the B share. So what if he sells the B share? Then she gets 50% of that. Well, why is that any different? Why should it be any different for the A shares? The A shares have the same pedigree. The A shares have the same mother. But it didn't become a reality. See, you keep avoiding non-marital entity. This isn't about marital or non-marital, Your Honor. I keep saying, though, in a divorce proceeding it is because it terminates an equity interest. Marital or non-marital is only relevant for purposes of classifying property for the division. So if a party comes into them, and actually this basically, in answering your question, I'll show you how it actually supports my position. When you come into the marriage, if you have something from before the marriage, it's non-marital. If you acquire something during the marriage, it's presumed to be marital unless you acquired it in exchange for property owned before the marriage. Philip Kerafotis came into the marriage with this asset. It was his non-marital property. He didn't have to give her a piece of anything. He didn't have to agree that if he died she got it. He didn't have to agree that if he sold it she would get half the proceeds. He agreed to deviate from the statute. He agreed to give her a right, whether you call it marital or non-marital. He agreed to give her a piece of the action that she otherwise wouldn't have been entitled to based on the strict application of the statute. He liberalized her rights. So the question is, when he agreed to give her 50% of that asset if he sold it, and you look at what that asset is and what it became, all that you have after the divorce is that you have an asset transform. Let me give you an example. A million of them come to my mind. Let's assume that he didn't have a membership. He had a farm. He had a 1,000-acre farm, and it was tended, but he didn't run it himself. He hired farmers, or he had farmers come on the land, and they would pay him to, which is done, they would pay him for the privilege of farming on the property. And at the time of the judgment, it was 1,000 acres, and it couldn't be subdivided. You couldn't sell off 10,000 acres or 100 acres or anything. It's only 1,000. And he agrees that if he sells the farm, he'll give her 50% of the net proceeds. Well, lo and behold, after the divorce, it's rezoned, and it's rezoned. And you know what he does? He says, man, I got a lot of money here. Look at all this equity here. I can make more money than just leasing it out. People want to build. All kinds of things are going to happen. So I'm going to sell off 90% of it. I'm going to sell it for, you know, $20 million. And she comes back and says, hey, I want my half of that 20 million. He says, well, you don't get your half. Why not? Because I still own the farm. I've got a little piece of it. You know, it's a piece of it, but it still airs the same addresses and the same land. So what you're saying is that the asset may still be there, but it's either been looted from or diluted significantly. Part of the asset is still there. So if you go back to before the divorce, when they were dividing, what they had was, and the CME explains this in all the papers, and it took me a while to figure it out. You know, maybe it took other people a while to figure out, but it took me a while to figure out. So they have this huge wealth tapped in a business, but they can't get it out. All they can do is buy and sell what they call the seat. So they said, here's what we're going to do. We're going to take this and we're going to convert that asset into stock, a B-share. And the reason we're going to have the B-share is just so that those are the people. We don't want just everybody coming into our club. We only want to limit it. So we'll give the B-shares to the existing members and that's their stock, but we're also going to give them all this Class A stock, and that represents all that pent-up equity in this, and that is their membership. Their membership before, it's the same ownership interest. They have the same percentage. Each member has the same percentage ownership in the new entity initially as they did in the old entity, only instead of it being represented by this seat, they called it, the vernacular, now it's represented by stock, but not just B stock. A stock, too, because at first it wasn't publicly saleable. There was a step in the process before the stock was made available to be sold to the public where all they did was the members had the stock. And then ultimately they had to go through the prospectus and all that procedure. Before that happened, Philip Karifotis, his old membership was gone. Instead, he has Class A stock, Class B stock, and a new membership in a new entity. So what I can't see, and I know I understand Your Honor is wrestling with this, what I can't see is how an argument could be fashioned that says that Pamela Karifotis is not entitled to half of that. Because if I have a pie, and the pie is the whole, and I agree that if I sell the pie I'm going to split half the proceeds with somebody else, and later on I cut the pie into 20 pieces and I sell off all the pieces except one, if I had an interest, if I had a 50% interest in all the pieces, why don't I have a 50% interest in each of the pieces? So if Pamela Karifotis was entitled to 50% of the 100%, how does that 50% disappear just because the 100% is transformed from one type of ownership evidence into a different type of ownership evidence? But we go back to the initial issue and question. There was a clearly written contract that said X, and it did not address this. A well-written contract would have said if subsequent to this X occurs, it's a condition preceding or a condition subsequent, and this must be re-evaluated. Well, maybe he should have said that. Well, I mean, that's the answer. But here is the answer. But he doesn't have to. Well, absolutely. Because where a contract law says you get what you get and you don't get what you didn't bargain for. But she bargained for the proceeds of one half of that asset. Conditioned on two things. Conditioned on the sale. His death or the sale. Okay. And the conclusion is by the CME and the rules of the CME and contract law is that there is no sale. What contract law? Judge Betar didn't, I don't think, got it totally wrong. I think he researched it very thoroughly. What did he sell? What did he sell and where did he get it? He sold an interest that came about subsequent. No. No, the interest didn't come about subsequently. The interest was the same. He traded it in. Your Honors, I understand. Let's assume that he keeps telling us. Why does Philip Carrefour just keep telling us that the Class A stock fell from the sky? He walked out one day, a satchel came down and hit him in the head, knocked him down and he got up and he opened it up and, my God, there was this Class A stock. It's a bonus from heaven. It didn't come that way. Where did it come from? The Class A stock was his membership. It was his membership and as of the day he received it, that's all it was. His membership wasn't the Class B stock. Counsel, why don't you do us a favor and explain as succinctly as you could why you believe that it would be arbitrary for the court to find that a sale did not occur. Well, I think it's arbitrary to find that a sale did not occur because we know a sale did occur. Class A stock was sold. There's no doubt that a sale occurred. The judge found no sale occurred but a sale did occur. The only question is what was sold. And in order to rule against my client, the court below had to conclude and this court would have to conclude that what was sold did not represent the membership that my client had a 50% interest, a right to 50% of the proceeds from. Now, in order to conclude that, Your Honors have to, you say contract law. I don't see any contract law that says that. Your Honors would have to disagree with the CME. Your Honors would have to say that what the CME happened didn't happen. Your Honors would have to say that when the CME says. But the CME said it didn't happen. No, the CME said it did happen. The CME says that the class A stock represented the old membership. It replaced the old membership and it represented it. The class A stock you sold was the old membership. It was a part of the old membership. That's what the CME says. And it says it over and over and over again. So what Your Honors would have to do is say that the CME was wrong. Now, Your Honor asked a question earlier about what did they talk about. And I asked Phil Kerfotis about that at his deposition. Although I don't think that this is a parole. A case where parole evidence is appropriate. But I think the parole evidence, if you look at it, supports Pamela Kerfotis. Because Phil Kerfotis, when I was taking his deposition, and it's in the record and it's all there, basically he had talking points. He had a mantra. Stock was off the table. No stock. Stock was never part of the agreement. Never agreed to stock. No stock, no stock, no stock, no stock. That's a conclusion. That's an assertion. That's a rant and it's a rave. So when I asked Mr. Kerfotis, Mr. Kerfotis, tell me, can you tell me if you had a conversation with Pamela Kerfotis where you said, if there's any stock, you don't get any part of it. He says, I don't remember. Okay. I asked Mr. Kerfotis, did you ever discuss the mutualization with Pamela Kerfotis? Oh, yes. Where was that? It was in Mexico. We were both living in Mexico. Well, what happened? Well, I got this memo from this letter from the CME that says, here's the mutualization plan, which is not too dissimilar from what happened. Well, did you read it? I skimmed it. Did you read the paragraph that talked about untapping rights and stock? Well, I don't remember. Well, did you discuss it with Pamela? Oh, yeah. I took my dog for a walk, knocked on her door and said, congratulations. The CME is going public. Well, what did she say? She said, okay, and closed the door. Mr. Kerfotis, did you have any further discussions with Pamela Kerfotis about the demutualization between the time when you got the plan and the settlement agreement? No. That's it. That's the big discussion that they had that says that if it demutualized and if the membership interest was replaced with stock, that she wouldn't and he sold the stock that replaced the membership so that the stock equals the membership, she wouldn't get a piece of it. He'd get to keep all that. Is there anything in the MSA or any of the divorce proceedings that would lead the court to conclude that the parties intended this particular asset, this IMM seat, to be governed by whatever was going to happen in demutualization? Is there anything in there where they were talking about the fact that this might change and it might change rather soon? No, they didn't say it would be affected and they didn't say it wouldn't be affected. And what I say to that is that if Philip Kerfotis was so worried, as he said, that there was going to be stock or that it was going to be transformed into stock and he didn't want Pamela Kerfotis to have a piece of that, well, why didn't he say to her, Pamela, I want to make sure that the agreement says that if my interest that you get 50% of is converted into stock, that you don't get stock. Well, he didn't do that and the agreement doesn't say that. And ironically, although Philip kept talking about stock, stock, stock, that's all there was afterwards. The B share is stock. The A shares were stock. So when he says in a conclusory fashion, she was never intended to share in the stock, well, that's the only thing she could have shared after the demutualization if it went through because that's all there was, there was stock. Now, Philip conceived that the B share is subject to her rights. What happens if there's another transaction and the CME splits up the B share or disengages a membership from the B share and now the B share splits into classes? He says she's entitled to half of the proceeds from the B share of the sales, but I suspect he would take that back if that B share was converted. Now, the agreement doesn't talk about the B share. The agreement doesn't say A share, B share, she's entitled to B share but not A share, but he's saying under the agreement she's entitled to share in the B share but not in the A share. Well, where does that come from? Why would that be if they have the exact same pedigree? So it seems to me that any which way you look at it, the asset that was sold, and I understand that if there was a transformation, I understand that you have to look really carefully to distinguish, to look at and analyze what Philip is calling my membership that I still have from the membership he had then and understand that the membership he has now is not the membership he has then. He doesn't still have it. It's still called 602. He still gets the trade, but it's not the same membership. The CME that existed before doesn't exist anymore. It exists, but it's been reconstituted. There's this public corporation. The membership's been replaced. It's a new membership in a new company. The CME tells us that. The stock that he sold and the stock that he still has are what he received in exchange for the old membership. The old membership is gone. He's got a new membership. The mere fact that he has A membership, which was a piece of the old membership, does not mean that Pamela shouldn't get her share of what she bargained for. Unless there are no further questions, I think we're pretty much covered. Thank you very much. May it please the Court. Counsel. Counsel. Counsel said that there was an agreement to give Pamela a piece of the action. That's not in the marital settlement agreement. Either the marital settlement agreement is ambiguous or it's not. As you know, we contend it's not ambiguous and Pamela agrees, but nevertheless that determination was for Judge Vitar and it's also for your honors. Whether it's ambiguous or not, our position is that the circuit court's decision should be affirmed. If you consider upon the four corners of the document that the marital settlement agreement is not ambiguous, the agreement doesn't grant Pamela this one half equity interest that she claims. The only interest she has is what the marital settlement agreement gives her. One half of the net proceeds upon a sale of the IMM membership, transfer of the entire IMM membership if Philip predeceases her. There's also an interesting point. She is entitled to that portion of what Philip derives from the seat to satisfy a 72-month maintenance obligation under the marital settlement agreement. That maintenance has been paid. That's from the rent? Correct. Anything else that Philip derives, all other proceeds that he derives from the membership, belong to him because of the waiver clause that your honor pointed out previously. The marital settlement agreement, the reason it doesn't refer to stock and a sale of stock resulting in one half of the net proceeds of the sale of stock going to Pamela, we know this from Philip's testimony because he said stock was not part of the deal. It's not a poorly drafted agreement. It would only be a poorly drafted agreement if stock were intended to be part of the deal, yet somehow omitted. And as your honor pointed out, there's nothing in the record that shows definitively that the parties intended something other than what's set forth in the marital settlement agreement. So there was no agreement to give her a piece of the action. What about the argument that there is an interest, and you can clarify for me, the transfer and invested in each share? I'm sorry, your honor? There was a sale. Yes. And there is an interest transfer and investing of an equity interest. So they're saying it starts, the whole thing is a bundle. There's an equity interest in the total bundle. And when it was split up into thirds, there was still an equity interest, which was divisible. And therefore, when it transferred, there was a partial sale, and it vested as an equity interest. Well, I disagree with this analogy that counsel talks about of pies and pieces and shattering into pieces. The receipt, the issuance of the Class A stock to Philip was a proceed that he derived from his membership of the IMM, from his ownership of the IMM membership. It's indistinguishable from whatever monthly income he could generate from leasing the seat out to be used and operated by somebody else on the exchange. Pamela's argument is based entirely upon what she says, what CME says. But counsel, if it's indistinguishable, why doesn't she get 50%? It's indistinguishable from the income. The shares that Philip receives is a one-time distribution that he receives from his continued ownership of the IMM membership interest.  It's from his continued ownership of the IMM membership. Pamela's not entitled to one-half of each monthly distribution that Philip receives, only that portion to satisfy the 72-month maintenance obligation, which has been satisfied. He then receives a one-time distribution stock. She's not any more entitled to that than she would have been to the monthly income obligations, and there's no dispute that she's not entitled to those. How do you come to that conclusion? I mean, they're not in here saying that the 72 months hasn't been satisfied. That's not an issue. I don't come to that conclusion. The CME does. Because at page 245 of the appendix, the CME itself says, Philip Tarifotis owns international monetary membership number 602 at the Chicago Mercantile Exchange, Inc., and he purchased such IMM membership on March 9, 1972. Pamela's argument is based upon what she says the CME says. But the document that counsel refers to is an informal tax advice memorandum. It's not the transaction documents themselves. The letter from the CME itself says that the IMM membership that Philip owns today is the same IMM membership that he owned in 1972, the non-marital asset that he brought into the marriage, the non-marital asset that he agreed to give proceeds from to Pamela if certain specific conditions were met, none of which conditions have been met. So clarify for me, because it seems that a lot of this hinges on non-marital. So you're saying he brought this in. She has no rights to it. Other than whatever he gives her under the marriage. They divorce. She's entitled to nothing except what is conditioned on. So therefore, if this changes form, he keeps it because it's still his non-marital asset and not hers. And nothing in between changes because there's nothing in the agreement to say that it changes. Correct. Because if there had been an attempt to bargain for a share of stock to be received, whether from demutualization or otherwise, Philip would not have agreed to that provision because as he testified in his deposition, as counsel pointed out, he spoke with Pamela and it was agreed that there was not going to be a provision in the agreement for her to receive a share of any stock. So one step further, if the actual seat doubles in value for some reason, in contrast to his argument about the farm, and it increases, doubles, she's entitled to nothing at all, period, unless that was less than 72 months or unless he dies or decides to give it to her. Or if he decides to sell it. If he sells the IMM membership number 602 during his lifetime, let's say two months from now he decides to sell the IMM membership, she's entitled to half the proceeds from that sale. And based upon what we've put forth in the record, half the proceeds from the sale of the IMM membership subsequent to demutualization would yield an even greater value than the seat had at the time. But going back to my example then, if I'm thinking this through, if he decides then to just use this money that he makes off the seat, he can do that because that doesn't sell the seat. He can spend that money. Yes, and that's what he intended to do. He intended to live off of the proceeds of this seat. But, you know, that's going back to the 72 months. That's not an issue here. The income that he derived and that she got money from for 72 months is not an issue here. What is at issue is your claim that there was not a sale when your client not only had a sale, probably had multiple sales of this stock over a period of time selling the Class A shares. So it seems to me that you're parsing that word pretty heavily. Well, wait a minute. Let me ask, what if he goes and buys more shares with the money he makes, not of the sale of stock, but from the profit of the B.C.? Does he then obligated to give her a part of that? I'm asking both of you. I'm tough. Well, I don't know whose question to answer first. Well, answer my question first. He's in the middle, so I'll defer to that. I'm trying to think this through independently with his farm in mind, and I'm trying to come to an understanding of what that share really means. I'm trying to correlate between alleged sale of a share or an event that didn't occur with a cash benefit that accrues in that B.C. that would be correlative to this. And he does sell that off. I mean, he buys more. And my question is, does that mean she is now entitled to half of that if he dies? Okay. You're saying that he generates income from his continued ownership of the membership, and with the income that he generates from his continued ownership of the membership, he buys another membership, let's say? Right. And he dies. Is she entitled to one membership or two? Right. She's entitled to one. What he does with the income, what he does with the membership. But only part of the one, according to you. In other words, if this is membership 602 in this folder we have here, and it represents, let's say, $3 million, and you take all of this, $2.2 million out of it, and leave this in there, she can still get that, because that's still membership 602 is there. It's just been the wallet's been lightened up a little bit. I don't understand. Are you talking about proceeds that Philip derives from his continued ownership? I'm talking about an asset that was sold in pieces, not completely depleted, but an asset that was sold in pieces that the agreement would appear to express the intent of the parties that if you're going to sell it, then 50% of it should go to his ex-wife. I disagree with that premise. That's not what happened. Depends on what the meaning of the word sale is? No, it depends upon what the meaning of IMM membership number 602 means. And we know that the CME says that it's the same seat that he had in 1972, because that's what it said in its document. To me, counsel, with all due respect, to me that's like the commercial where you have those two kids sitting down there, and the man says, would you like a pony? And he gives the little girl a plastic pony, and then he asks the other girl if she wants a pony, and then trots a real horse. I mean, in this case, that 602 is still there. It's just $2.2 million less value. No, that's not true, Your Honor, because the marketability of the IMM membership 602 at the time of the marital settlement agreement was the value that it could have derived at sale at the time of the marital settlement agreement was less than the value that it could derive at sale even today, notwithstanding the class issue. But the contract that you're talking about is not talking about sale at that time. It's talking about the possibility of a sale in the future. So if you're talking about the possibility of a sale in the future, and when you come around to the future and decide to sell it, now it's not a unitary thing. It's made up of a couple different things, and he's selling off more than half of it. She's not entitled to any of it. I'm saying that the facts are undisputed in the record that this is not the case where all of the marketable value that the IMM membership had at the time of the marital settlement agreement was spirited away. This is not the case for what could have been sold and where value could have been obtained in 2000 where most of that was taken out of Your Honor's red belt and put aside on Your Honor's bench. What could have been derived from a sale of the IMM membership in 2000 is less than what can be derived by Pamela today. But that's not what the contract isn't talking about that she's entitled to 50% of what the value of it is as of the time of the MSA. If that was the case, we'd be dealing with a different kettle of fish. You're talking about if he sells it in the future or if he predeceases her in the future, she gets 50% of it. So it's not the value as of the time of the MSA that the parties were trying to talk about. However, inartfully, they're trying to talk about what the potential values would be in the future, it seems to me. Well, what I'm pointing out, what I'm attempting to point out, Your Honor, is that what we are dealing with here is a contingency that was not expressed in the marital settlement agreement. That future issuance of class A shares, which could have been addressed in the party's agreement if the parties intended its inclusion. We know from right, the first district of the appellate court said, special service area taxes are not something kind of, sort of like special assessments. What Pamela is arguing here is that there's been sort of, kind of, kind of, sort of like a sale of the IMM membership  But because of the specific condition precedent that must be met, sale or predeceasing, that's not good enough. Under MXL versus Mulder, we know conditions are subject to rules of strict compliance. And we haven't demonstrated strict compliance with any of the conditions present here. If he sold both of these on the same day, okay? Tells his broker, sell my 10,800 shares of class A stock. And he goes to the mercantile exchange and he says, I'm not going to try to lease the seat. I want to sell it. Let's get a bid and ask on that. Is she entitled to 50% of what he recovers on that day from both? No. Why not? She's entitled to half of the proceeds of the sale of the seat, the IMM membership number 672. Where does he get the class A stock from? He gets the class A stock no different than the monthly check that he gets from leasing the seat out to somebody else to use in operation. It's a proceed that he derives from his continued ownership of the membership. But now I come back to the non-marital. Yes, Your Honor. That's non-marital. Yes, Your Honor. Therefore, she's not entitled to it. Yes, Your Honor. It's non-marital, but it's in the marital settlement agreement. Subject to conditions that have not arisen here. Only because you say that a sale hasn't occurred. I have said that a sale hasn't occurred. The CME has said that a sale hasn't occurred. Judge Petar has said that a sale hasn't occurred. You and the judge clearly have. There's no question. That's why we're here, I assume. If Philip had not sold the stock, the class A stock, and he suddenly died, Yes, Your Honor. what would be Pamela's damages? What would she be entitled to recover? If Philip predeceases Pamela, He didn't do the sale, and then suddenly he died. IMM membership number 602 would be transferred to Pamela. And she'd have the right to enforce that claim against his estate. What about the class A stock? That belongs to Philip. However, he chooses to devise it in his estate. The same way the cash that he receives from monthly rental of the seat belongs to him. If he accumulates that in a bank account somewhere, if somebody decides to, you know, says, I want to rent out your seat. I'm strapped for cash, but I have a pony. You know, for six months' use of IMM membership number 602, can I give you a pony? And Philip says yes, and then he dies. That pony doesn't go to Pamela. Class A shares don't go to Pamela. Because the CME decides to come out with this IPO and goes through the stages that it goes through and divides it up into class A and class B, it's just her tough luck. She gets the plastic pony. She gets the class B one share of stock and not the 10,800 that are sold for millions. I disagree that it's a plastic pony, Your Honor. It is just as alive and just as swift and just as smooth to the touch as it was in 2000 at the time of the party's marital settlement agreement. For you to suggest that it used to be this flesh and blood pony and it became something plastic, a mere hulk, forgive me, a mere husk of what it used to be, is not borne out by the facts. Now, I say even if the class B share, even if the IMM membership interest 602 today were less, were less in value than it were in 2000, yes, my argument would be the same. What I would submit, and I would agree with you, that Pamela would have a stronger, more intuitive argument. But because that isn't the case, my position remains the same. And Pamela's position is even weaker and less intuitive because this is not the case where the issuance of the class A shares has torn all of the marketable value out of the IMM membership that it had. It just created $2 million worth of value that he gets and she has no interest in. Yes, because of the nature of the marital settlement agreement where the IMM membership belongs to him and only whatever additional interests are granted to her, subject to whatever conditions are set forth and occur under the marital settlement agreement, does she get anything from the IMM membership. It's because, presumptively, the IMM membership and all that is derived from it belongs to him. If it were less or more, that's just the nature of facts over time. All right. Counsel refers to Smithburg, which is a pension death benefit case. And that has no application to this case because if Philip predeceases Pamela, she would have a claim to the IMM membership. That claim would be enforceable against his estate under the explicit provisions of the marital settlement agreement. Even if the marital settlement agreement didn't give her the right to enforce that claim against his estate, Smithburg would grant it to her. We don't deny that, so that has nothing to do with this case. But if this Court were to consider pension benefit line cases, I'd point this Court's attention to marriage of Marshall, 166, 113, 954, the 4th District, 1988, where the Court is dealing with what happens when the marital settlement agreement gives somebody retirement benefits from a pension, but all of a sudden disability benefits occur. And in Marshall, the Court said that the wife is not entitled to disability benefits to the extent that they would exceed the normal retirement benefits that the husband would get under the pension. And the Court actually uses the word windfall, and it says that it's going to construe the marital settlement agreement to prevent the wife from recovering a windfall, not contemplated by the parties. I think that Your Honor is concerned about the unfairness, what Your Honor sees as unfairness, of Philip retaining an asset pursuant to the terms of the parties' marital settlement agreement. No, but what I'm concerned about is that the strained articulation that you come up with to say that there's no sale, when there were dozens of sales, would operate to not achieve the intent of the parties that I think is fair to read from the four corners of the document here. If the parties had truly thought that there might be stock and stock would be off the table, I would think that would be in here. But they didn't anticipate the specific vehicle here, but they did anticipate that if it was sold, that she would get 50%. That's what I'm struggling with, is to try to figure out, and that's what I think we're here for, to figure out what the intent of the parties are. Well, if the court finds the, if the court looks at the four corners of the document and considers the agreement amicably with the parties' intent on that point, then the court looks to the extrinsic evidence of record. And the only extrinsic evidence of record here, remember, Pamela Mooth for summary judgment, Judge Bittar denied that motion, and Pamela went in and said, I've got no more facts to present in support of my petition. Let's mark this file and let me take it up to the appellate court. And Judge Bittar said, all right. So the only extrinsic facts of record are the ones that are in the record. And based upon those extrinsic facts of record, there's no way to conclude that the parties intended that Pamela would get stock that was issued upon demutualization. The only testimony on that point is in Philip's favor. Again, I think that the marital settlement agreement would only include language if it intended to confer something upon Pamela that it did not already confer. Should Philip, such as, should Philip receive an issuance of stock based upon or on account of his membership, his ownership of IMM membership number 602, Pamela would be entitled to receive half of the net proceeds of any sales of any such shares of stock. Inclusion of that language in the marital settlement agreement would then confer upon Pamela the right that she's seeking. What Pamela is asking you to do today is to enforce that provision, that provision that I just recited to you. But that provision is included nowhere within this marital settlement agreement. In order to grant the relief that you, in order to grant the relief that Pamela is seeking here, your honors would have to rewrite, reform the marital settlement agreement to add that provision into it. And that, your honors, cannot do because of clear precedent saying that the court can't write into marital settlement agreements contingencies that the parties either thought about and decided not to include or didn't think about and therefore didn't include. Either way, the court can't reform or rewrite the marital settlement agreement to add that language that I just recited, which in essence is the provision that Pamela is seeking to enforce here, which is not contained within the marital settlement agreement. Unless your honors have any further questions. No, thank you. Thank you very much, your honors. I'll try to be brief. It's not always easy for me, but I'll try. And I may, if I jump around, please forgive me, but I want to cover briefly the main points that I think counsel made and that I think we're arguing about. First of all, counsel argues that Pamela is trying to enforce an agreement that doesn't exist when the fact is Phillip is trying to enforce an agreement that doesn't exist. Phillip contends that the agreement was that only if he sold membership number 602 would Pamela get one nickel from the sale. Well, I challenge anybody to find where the agreement says that. And, in fact, that's a figment of Phillip's imagination. When I asked him at his deposition at page 96, appendix 252, if he had a discussion with Pamela where she said, I agree that stock is not part of the agreement. He answered, I don't know. And then he volunteers because we didn't know if there would be stock. So the reason Phillip says at his deposition he didn't pin Pamela down and say you don't get any stock is because he didn't know if there would be stock. So there was no affirmative intention on Phillip's part to preclude Pamela from sharing in the proceeds of stock if the membership was converted into stock. He testified at his deposition that he didn't know if demutualization was going ahead. In fact, he said he was against it. He wasn't going to vote for it. It wasn't the foregone conclusion that there would be stock. And he indicates at his deposition that he didn't really understand that the membership might be converted into stock. He seems to think then and still thinks that the stock was just going to be given to him as proceeds like rental. Is counsel still arguing that? I don't know where that comes from. Show me a piece of paper in this entire record, it doesn't exist, that says that the stock he received was a dividend, that the stock he received was proceeds like rental. It wasn't. The legal documentation of the CME said that the stock was received in exchange for the old membership. Now, interestingly, let's talk a little bit more about this 602. Phillip says at page 98 of his deposition, appendix 253, after he realized that he screwed up when he testified about not having a conversation with Pamela about the stock and that he didn't know about stock, he says the reason that the stock wasn't on the table, he says it became clear to him that it wasn't going to be part of the agreement because the agreement was going to say, I'm quoting, number 602, Chicago Mercantile Exchange International Monetary Membership. He says in his deposition, the agreement was going to say 602. So that's what it was going to be about, whether or not he sold 602. But then I asked him, you know, where, show me, show me the agreement. And then he concedes at page 253, I'm sorry, page 101, appendix 253, that the agreement does not reference membership number 602. There is no agreement that limits Pamela's right to a sale whereby 602 is gone, 602 is terminated. That agreement does not exist. We don't dispute, as counsel says, that he still holds this membership number 602. But that's really not what this case is about. The case is not about what he has retained. The case is about what he has sold. And he has sold off parts of the original membership that's undisputed and undisputable. And I just want to close with where I sort of where I began and where I think I was in the middle and where I think I am at the end because that's really what the case is about. And I can quote from CME, the memorandum at my appendix 133, quote, participation in old CME was represented by membership interests, quote, the old membership interests. That included both equity interests and non-equity membership rights. In the demutualization, the members of old CME exchanged their old membership interests for Class A and Class B common stock of the new Delaware Corporation, new CME. Okay. That's what happened. The old membership interest was exchanged for stock and the new membership interest. He sold the stock. It's the beginning of the case. It's the end of the case. The only person here who has received the windfall so far is Philip Kiaropotos because the millions of dollars in equity in the seat that my client was supposed to receive 50% of has been sold off by him, and he hasn't given her one nickel of it. So we're asking your honors to reverse the judgment of the circuit court on this de novo review, and we ask for a summary judgment in favor of Pamela. There's no dispute as to the amount of money involved. Thank you very much. Thank you.